**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

C.O., a minor,
                                    *Plaintiff,*

        and

PAT OMAN,
                            *Plaintiff-Appellee,*

        v.

PORTLAND PUBLIC SCHOOLS,
Multnomah School District No. 1;
CONSTANCE BULL, individually and
in her capacity as PPS Special
Education Attorney,
                    *Defendants-Appellants,*

        and

MAXINE KILCREASE, individually
and in her capacity as PPS
Program Director; THERESA
MIDDLETON, individually and in her
capacity as PPS District
representative; JANET WAGNER,
individually and in her capacity as
PPS District representative; JACK
UBIK, individually and in his
capacity as Fernwood Middle
School Principal; ALANA COULTER,
individually and in her capacity as
PPS Special Education supervisor;

OREGON DEPARTMENT OF
EDUCATION; SUSAN CASTILLO,
individually and in her capacity as
Superintendent of Public Schools;
PORTLAND PUBLIC SCHOOL BOARD;
MARY MERTZ, PPS Director of
Special Education; STATE OF
OREGON, by and through its
Department of Education;
OFFICE OF ADMINISTRATIVE
HEARINGS; SUZY HARRIS; NANCY
LATINI; THOMAS EWING; DEANNA
HASSANPOUR, in her official
capacity as Deputy Chief
Administrative Law Judge of the
OAH; VICKI PHILLIPS, PPS
Superintendent,
                      *Defendants.*

No. 10-35340
D.C. No.
3:05-cv-00558-HU

C. O., a minor,
                      *Plaintiff,*
          and
PAT OMAN,
          *Plaintiff-Appellant,*
          v.

PORTLAND PUBLIC SCHOOLS,
Multnomah School District No. 1;
CONSTANCE BULL, individually and
in her capacity as PPS Special
Education Attorney; OREGON
DEPARTMENT OF EDUCATION; SUSAN
CASTILLO, individually and in her
capacity as Superintendent of
Public Schools; SUZY HARRIS;
NANCY LATINI; OFFICE OF
ADMINISTRATIVE HEARINGS; THOMAS
EWING; DEANNA HASSANPOUR, in
her official capacity as Deputy
Chief Administrative Law Judge
of the OAH,

> *Defendants-Appellees,*

and

MAXINE KILCREASE, individually
and in her capacity as PPS
Program Director; THERESA
MIDDLETON, individually and in her
capacity as PPS District
representative; JANET WAGNER,
individually and in her capacity as
PPS District representative; JACK
UBIK, individually and in his
capacity as Fernwood Middle
School Principal;

ALANA COULTER, individually and
in her capacity as PPS Special
Education supervisor; PORTLAND
PUBLIC SCHOOL BOARD; MARY
MERTZ, PPS Director of Special
Education; STATE OF OREGON, by
and through its Department of
Education; VICKI PHILLIPS, PPS
Superintendent,

                    *Defendants.*

No. 10-35402

D.C. No.
3:05-cv-00558-HU

OPINION

Appeal from the United States District Court
for the District of Oregon
Dennis James Hubel, Magistrate Judge, Presiding

Argued and Submitted
January 12, 2012—Seattle, Washington

Filed May 14, 2012

Before: Diarmuid F. O'Scannlain and Johnnie B. Rawlinson,
Circuit Judges, and Donald W. Molloy, District Judge.*

Opinion by Judge O'Scannlain

---

*The Honorable Donald W. Molloy, United States District Judge for the
District of Montana, sitting by designation.

## COUNSEL

Bruce L. Campbell, Miller Nash LLP, Portland, Oregon, argued the cause and filed the briefs for the appellants-cross appellees, Portland Public Schools, Multnomah School District, No. 1 and Constance Bull. With him on the briefs was J. Michael Porter, Miller Nash LLP, Portland, Oregon.

Pat Oman, pro se, Portland, Oregon, argued the cause and filed the briefs for the appellee-cross appellant.

Inge D. Wells, Oregon Department of Education, Salem, Oregon, argued the cause and filed the brief on behalf of the cross-appellees, the Oregon Department of Education, Susan Castillo, Suzy Harris, Nancy Latini, Chief Administrative Law Judge Thomas Ewing, and Deputy Chief Administrative Law Judge Deanna Hassanpour.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide, among other things, whether a parent may bring a claim for nominal damages under the Individuals with Disabilities Education Act.

I

In the 1970s, there was considerable concern about the manner in which children with disabilities were educated in this country, particularly the tendency of educators to isolate them from their non-disabled peers. Congress responded by passing the Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 773 (1975), which evolved into the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*. The goal of this landmark legislation

was to "ensure that all children with disabilities have available to them a free appropriate public education" (a "FAPE"). 20 U.S.C. § 1400(d). Congress, however, never sought to lay out a comprehensive definition of that term. Instead, it set out broad requirements, *see, e.g.*, *id.* § 1412(a)(5) (requiring disabled children to be educated in the same classrooms as non-disabled children to the "maximum extent appropriate"), offered States funds in order to pursue them, and granted the United States Department of Education authority to monitor how those funds were spent, *see id.*

As a result, the primary authority for determining what substantively constitutes an "appropriate public education" remains where it always was—with the States, specifically with State Educational Agencies and Local Educational Agencies. *Id.* § 1401(19), (32). These entities are delegated the responsibility to locate disabled children within their geographical area, *id.* § 1412(a)(3), and the authority to develop for each of them an individualized education program ("IEP"), *id.* § 1414(d). Congress has also preserved a significant role in this process for parents, providing them with procedural rights under the IDEA, such as the right to participate in the development of their child's IEP, *id.* § 1414(d)(1)(B), and to challenge the IEP through the State's administrative system, *id.* § 1415(f)(1)(A). Finally, Congress has provided that a party dissatisfied with the outcome of these proceedings may seek prospective relief in federal court. *Id.* § 1415(i).

## II

### A

Pat Oman is the mother of C.O., a young man who was diagnosed as having special learning needs in 1996 when he was a second grade student in the Portland Public Schools, Multnomah School District No. 1 ("District"). Oman worked with educators to develop an IEP for her son, and the District began implementing it the following year. Unfortunately,

C.O. did not progress as quickly as either his mother or his teachers might have liked. And by the time that he applied for the District's magnet high school in 2002, he wrote at only a third grade level. As such, he fell well below the high school's minimum entry requirements of meeting eighth grade benchmarks.

Upon receipt of the news that her son would be unable to attend the magnet high school, Oman requested all of C.O.'s records, including those in the sole possession of his teachers, to investigate what had happened. Meeting with limited success, her relationship with the District quickly deteriorated.

B

In March 2004, Oman filed an administrative complaint alleging numerous procedural and substantive inadequacies in C.O.'s IEP. Oman met several times with officials from the District to resolve their differences. When it became apparent that negotiations would be fruitless, however, the District went into litigation mode. Its in-house lawyer, Constance Bull, informed Oman that her client would not make any factual stipulations, would not participate in an informal discovery process created by the Oregon Rules of Civil Procedure, and would not allow Oman to speak to its employees regarding the litigation without first discussing the matter with Bull.

After some limited discovery and a seven-day hearing, an administrative law judge of the Oregon Department of Education concluded that the District had indeed violated the IDEA, and ordered the District to provide certain compensatory education. Because places at Oman's preferred outside service provider were filled, C.O. was unable to begin (let alone complete) the ordered remedial education before the deadline set by the District. C.O. graduated from high school the following summer.

## C

Unsatisfied with the result of these administrative proceedings, Oman filed more than one pro se suit on behalf of herself and her son in federal district court, naming as defendants the District, the Oregon Department of Education, and several of their employees.

Oman alleged approximately twenty procedural and substantive violations of the IDEA. They may generally be categorized as (1) substantive inadequacy in C.O.'s education, (2) procedural violations in developing and implementing C.O.'s IEP, (3) placing illegal conditions on reimbursement requests, and (4) retaliation against Oman for exercising her statutory rights. Oman also asserted that the same conduct subjected the defendants to liability under 42 U.S.C. § 1983. She sought both monetary and prospective relief.

Finally, Oman alleged that the admissions policies for the District's magnet high schools—specifically their minimum entry requirements and their review of applications based primarily upon grades—violate Section 504 of the Rehabilitation Act as well as the Americans with Disabilities Act ("ADA"). Oman alleged that, while facially neutral, these standards discriminate against the disabled by ensuring that they are placed in more restrictive environments.

## D

The district court disposed of almost all of Oman's claims before trial. It dismissed all claims brought by Oman on behalf of C.O. because, as a non-attorney, she was not entitled to represent him. The district court further concluded that because Oman was not disabled, no claims under the Rehabilitation Act or the ADA remained. The court also dismissed claims for compensatory damages as unprovided for by the IDEA or by section 1983 to enforce the IDEA. Finally, after discovery was completed, the district court dismissed as moot

Oman's claims for prospective relief under the IDEA because C.O. had by then graduated from high school.

The district court awarded summary judgment on Oman's remaining claims except for those based upon three allegedly retaliatory acts: (1) Bull's refusal to participate in informal discovery, (2) Bull's insistence that Oman seek permission to speak to District employees about litigation matters, and (3) the Oregon Department of Education's delay in producing the administrative record during the federal litigation. A bench trial was held. The district court concluded that the delay in producing the records was due to good faith reliance on counsel rather than to a retaliatory motive. However, the district court found that Bull's actions were calculated to discourage Oman from exercising her statutory rights to challenge C.O.'s IEP. The district court held the District and Bull liable for $1 in nominal damages pursuant to the IDEA and section 1983.

The district court entered a final judgment in March 2010. The District and Bull timely appealed their liability for nominal damages. Oman cross-appealed a number of issues.

## III

In its appeal, the District argues that the district court erred by inferring from the IDEA a private right of action for nominal damages. We agree.

## A

**[1]** We have repeatedly held that the IDEA creates a "comprehensive enforcement scheme" in which compensatory damages play no part. *See, e.g.*, *Blanchard v. Morton Sch. Dist.*, 509 F.3d 934, 938 (9th Cir. 2007). The district court acknowledged these rulings and dismissed Oman's claims for compensatory damages. But the district court allowed Oman to seek nominal damages directly under the IDEA because, in the district court's view, recognizing such a cause of action

would promote compliance with the IDEA without upsetting Congress's chosen enforcement scheme.

**[2]** Assuming the district court was correct that creating a remedy for nominal damages would be more consistent with the congressional plan than creating one for compensatory damages,[1] this does not give federal courts license to invent a cause of action. Without some indication that Congress intended "to create not just a private right but also a private remedy . . . . a cause of action does not exist and courts may not create one, *no matter how desirable that might be as a policy matter, or how compatible with the statute.*" *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) (emphasis added) (internal citations omitted). Instead, where Congress provides funds to a State to pursue certain functions, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 280 (2002) (internal quotation marks omitted).

**[3]** As we have previously noted, "[t]he wording of the [IDEA] does not disclose a congressional intent to provide a [compensatory] damage remedy." *Mountain View-Los Altos Union High Sch. Dist. v. Sharron B.H.*, 709 F.2d 28, 30 (9th Cir. 1983). Nor does it disclose a congressional intent to pro-

---

[1]We doubt this is the case. Parties such as Oman, whose children have graduated from high school, do not have standing to pursue prospective relief under the IDEA. *See B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1263-64 (9th Cir. 1999). Creating a remedy for nominal damages would prevent such cases from becoming moot and would entitle the parents (if successful and if they had attorneys) to attorneys' fees. *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 297-98 (2006); *cf. Shapiro v. Paradise Valley Unified Sch. Dist.*, 374 F.3d 857, 865 (9th Cir. 2004) (noting that under the applicable test "a party may be accorded prevailing party status by being awarded 'some relief by the court' "). As such, recognizing a cause of action for nominal damages could have considerable impact on the remedial scheme.

vide a remedy for nominal damages. It does allow district courts to "give all 'appropriate relief,' but absent legislative history suggesting the contrary, such a phrase is usually construed as a mere grant of jurisdiction . . . and not of authority to award retrospective damages," *id.* (quoting 20 U.S.C. § 1415(e)(2)), whether they be compensatory or nominal. *See also Ortega v. Bibb Cnty. Sch. Dist.*, 397 F.3d 1321, 1323-25 (11th Cir. 2005) (refusing to infer a cause of action for nominal damages for failure to provide a nurse capable of addressing a child's medical needs). We thus conclude that dissatisfied plaintiffs such as Oman may not bring a claim for nominal damages under the IDEA.

B

**[4]** This does not end our inquiry, however, because Oman has also asserted a claim for relief under section 1983. While both questions depend upon congressional intent, "whether a statutory violation may be enforced through [section] 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." *Gonzaga Univ.*, 536 U.S. at 283 (internal quotation marks omitted). In this context, whether Oman may bring a claim under section 1983 turns on whether the gravamen of her claim for relief is under the IDEA. If it is, she is limited to the remedies available under the IDEA. *See Blanchard*, 509 F.3d at 938. If it is not, she may seek relief under section 1983. *See, e.g.*, *Witte v. Clark Cnty. Sch. Dist.*, 197 F.3d 1271, 1273 (9th Cir. 1999), *overruled in part on other grounds by Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 871 (9th Cir. 2011) (en banc).

In the related context of exhaustion of administrative remedies, we have recently reexamined our definition of what constitutes a claim for relief under the IDEA. *Payne*, 653 F.3d at 874. We had previously implied that the distinction depended on the specific injury alleged—for example a physical injury versus the denial of a FAPE. *Id.* at 873. But finding that

approach to be inconsistent with the language of the statute, we now consider whether a plaintiff seeks (1) monetary relief as the "functional equivalent" of a remedy available under the IDEA, (2) "prospective injunctive relief to alter an IEP or the educational placement of a disabled student," or (3) "to enforce rights that arise as a result of a denial" of a FAPE. *Id.* at 875.

**[5]** Oman claims that she was denied sufficient access to discovery during administrative proceedings, an injury that was clearly remediable through those same proceedings. She merely needed to make a formal request for it, and she did not. Her claim is therefore the functional equivalent of a claim of procedural defect under the IDEA, and she is limited to relief available under that statute. *Accord M.T.V. v. Dekalb Cnty. Sch. Dist.*, 446 F.3d 1153, 1158-59 (11th Cir. 2006) (concluding that retaliation in the form of additional testing fell within the gambit of the IDEA because it "relat[ed] to the identification, evaluation, or educational placement of the child or the provision of a [FAPE] to such a child" (internal quotation marks omitted)).[2]

### IV

In her cross appeal, Oman asserts that the district court should not have dismissed her claims for monetary relief under the Rehabilitation Act and ADA based on the admissions policy of the District's magnet high school.[3] We dis-

---

[2]Given that the IDEA does not provide a remedy for damages and C.O.'s graduation from high school renders us unable to provide the prospective relief that Oman seeks, *B.C.*, 192 F.3d at 1263-64, we lack jurisdiction to consider Oman's cross appeals based upon the IDEA.

[3]The district court did err by holding that as a non-disabled person Oman could not bring such a claim. *Barker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 825-26 (9th Cir. 2009). But we may uphold a district court's decision to dismiss for failure to state a claim based upon any ground supported in the record. *Shaw v. Cal. Dep't of Alcoholic Beverage Control*, 788 F.2d 600, 603 (9th Cir. 1986).

agree. Congress has not expressed an intent to create a cause of action for monetary damages based on such a claim.

The language of the ADA and section 504 of the Rehabilitation Acts differ slightly, but they provide that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation" in a program or activity receiving federal financial assistance, 29 U.S.C. § 794, or a public entity, 42 U.S.C. § 12132. These statutes provide a private cause of action in certain circumstances. *See Mark H. v. Lemaheiu*, 513 F.3d 922, 935 (9th Cir. 2008); *see also Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999) (describing a claimant's burden of proof under these statutes).

Recently, we concluded that in certain very limited instances, these statutes may even provide a cause of action for failure of a public school to provide a FAPE. *Mark H.*, 513 F.3d at 936. *But see Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 19 (1st Cir. 2006). In *Mark H.*, we noted that the Department of Education's regulations specifically require that recipients of federal funds "provide a free appropriate education to each qualified handicapped person" to comply with the Rehabilitation Act. 513 F.3d at 936 (discussing 34 C.F.R. § 104.33). As these regulations defined what constitutes a FAPE somewhat differently than does the IDEA, we decided that the IDEA does not preclude all claims based upon these regulations. *Id.* However, "regulations can only be enforced through the private right of action contained in a statute when they 'authoritatively construe' the statute." *Id.* at 935 (quoting *Sandoval*, 532 U.S. at 284). We therefore concluded that a parent may bring a claim for compensatory damages only if the regulations' "requirements fall within the scope of the prohibition contained in § 504 [of the Rehabilitation Act] itself." *Id.* Because the parties and the district court in that case had assumed that the IDEA had precluded relief under the Rehabilitation Act, however, we concluded that it was not yet time to define the contours of that potential cause

of action. *Id.* at 939-40 (noting that the parties had "not litigated" that issue). Those parameters remain murky.

**[6]** Whether a party may bring a damages action based upon the admissions policies of a magnet school is a question of first impression in this circuit, if not in this country, and thus we turn to the requirements of the Rehabilitation Act. "Section 504 by its terms does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate," but merely requires them not to exclude a person who is "otherwise qualified" based upon his or her disability. *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 405 (1979). To be "otherwise qualified," an individual must be "able to meet all of a program's requirements in spite of his handicap." *Id.* at 406; *see also St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 173 (2d Cir. 2001) (applying the *Davis* standard to a high school's special education evaluation process).

**[7]** Though we do not read this to give schools leave to adopt requirements that are not reasonably related to the program at issue, *cf. id.*, we "extend[ ] judicial deference to an educational institution's academic decisions in ADA and Rehabilitation Act cases." *Zuckle*, 166 F.3d at 1047. And it is not unreasonable to require a minimum of eighth grade proficiency from anyone who is applying to a magnet high school.

**[8]** That Congress did not intend to provide a private cause of action for monetary damages based on such a claim is confirmed when these provisions are read in the context of Congress's other education policies. In particular, Congress has explicitly contemplated that public school districts might create magnet and charter programs. *See* 20 U.S.C. § 1413(a)(5); 34 C.F.R. §§ 226, 280. It has required special approval by the Secretary of Education that any such program is in compliance with federal law for magnet schools to receive federal funding. 34 C.F.R. § 280 (implementing the

Magnet Schools Assistance Program). Hundreds of school districts have taken advantage of these procedures, many creating schools with competitive admissions policies more stringent than those here. *Cf.* U.S. Dep't of Education, *Successful Magnet High Schools: Innovations in Education* (2008), available at http://www2.ed.gov/admins/comm/choice/magnet-hs/index.html. And yet, we know of no case holding such institutions liable for violations of the ADA or Rehabilitation Act. Nor do we know of any regulation adopted pursuant to the Rehabilitation Act, the ADA, or the IDEA that prohibits such practices. Indeed the burgeoning number of charter and magnet school programs operating without the interference of either Congress or the Department of Education confirms that they are an accepted part of our educational system. As such, we will not impose liability upon them without further indication of Congressional intent.[4]

V

We have reviewed Oman's other contentions in her cross-appeal and find them either waived or lacking in merit.

[9] For the foregoing reasons, Oman's cross claims relating to the IDEA are **DISMISSED** for lack of jurisdiction. The district court is **REVERSED** as to its finding the District liable under the IDEA and section 1983 for nominal damages.

---

[4]We are similarly unconvinced by Oman's assertion that C.O.'s IEP was defective because the District failed to place him in a particular magnet school program in favor of a "more restrictive" environment. Neither the IDEA nor the Rehabilitation Act require that disabled children be placed in the program that their parents think would maximize their potential. *Bd. of Ed. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 189-90 (1982) (defining the "least restrictive environment" component of the IDEA); *cf. Mark H.*, 513 F.3d at 933 (noting that compliance with the IDEA is sufficient to satisfy the school's duty under the Rehabilitation Act). Instead, they require only that disabled and non-disabled children be educated together to the extent possible. 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 104.34(a). Oman has not alleged that the District failed to meet this requirement.

It is **AFFIRMED** on all other counts. The parties shall bear their own costs.

**DISMISSED IN PART, AFFIRMED IN PART, and REVERSED IN PART.**