**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| D. D., a minor, by and through his Guardian Ad Litem, Michaela Ingram, | No. 19-55810 |
| *Plaintiff-Appellant,* | D.C. No. 2:19-cv-00399-PA-PLA |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | OPINION |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted En Banc June 24, 2021
Pasadena, California

Filed November 19, 2021

Before: Sidney R. Thomas, Chief Judge, and Ronald M. Gould, Richard A. Paez, Marsha S. Berzon, Johnnie B. Rawlinson, Jacqueline H. Nguyen, Andrew D. Hurwitz, Daniel P. Collins, Kenneth K. Lee, Danielle J. Forrest and Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Hurwitz;
Partial Concurrence and Partial Dissent by Judge Bumatay;
Dissent by Judge Paez;
Dissent by Judge Berzon

## SUMMARY[*]

### Individuals with Disabilities Education Act

The en banc court affirmed the district court's dismissal of student D.D.'s action under the Americans with Disabilities Act against Los Angeles Unified School District for failure to exhaust administrative remedies under the Individuals with Disabilities Education Act.

The en banc court held that exhaustion of the IDEA process was required because the gravamen of the ADA complaint was the school district's denial of a free appropriate public education ("FAPE") in failing to provide a one-on-one behavioral aide and related supportive services. The en banc court applied *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743 (2017), which directs a court to ask two hypothetical questions: (1) whether the plaintiff could have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school, and (2) whether an adult at the school have pressed essentially the same grievance. Under *Fry*, a court also must consider the history of the proceedings, in particular whether the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

plaintiff has previously invoked the IDEA's formal procedures to handle the dispute.

Declining to revisit *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863 (9th Cir. 2011) (en banc), the en banc court rejected D.D.'s argument that he need not exhaust because he seeks compensatory damages for emotional distress, relief that is not available under the IDEA.

The en banc court declined to address whether D.D.'s settlement of the administrative proceedings that he pursued prior to filing suit equated to exhaustion. The en banc court also declined to address the related question of whether D.D.'s settlement rendered further exhaustion futile.

Judge Bumatay, joined by Judge Collins, and joined by Chief Judge Thomas and Judges Paez and Berzon as to Parts I.B and II, concurred in part and dissented in part. Judge Bumatay agreed with the majority that under *Fry*, D.D.'s complaint concerned an injury to his right to a FAPE. He wrote that he nonetheless would vacate the district court's order because, in his view, by the IDEA's plain text, when a complaint seeks money damages not available under the IDEA, the plaintiff is freed from the IDEA's exhaustion requirement. Chief Judge Thomas and Judges Paez and Berzon joined in Parts I.B and II of Judge Bumatay's opinion, stating that a plaintiff who seeks damages is generally not required to exhaust the IDEA process.

Dissenting, Judge Paez, joined by Chief Judge Thomas and Judge Berzon, wrote that he would reverse the district court's dismissal order and remand because the gravamen of D.D.'s operative complaint was a disability discrimination claim under the ADA.

Dissenting, Judge Berzon, joined by Chief Judge Thomas and Judge Paez, wrote that she joined Judge Paez's dissent in full and joined the dissenting portions of Judge Bumatay's opinion. She wrote separately to call attention to the question, not decided by the majority, whether settlement after IDEA-prescribed mediation amounts to exhaustion. Judge Berzon wrote that she would hold that the exhaustion requirement is satisfied when the parties have settled disputed IDEA issues through the administrative hearing and mediation process.

---

## COUNSEL

Shawna L. Parks (argued), Law Office of Shawna L. Parks, Los Angeles, California; Patricia Van Dyke and Janeen Steel, Learning Rights Law Center, Los Angeles, California; for Plaintiff-Appellant.

Matthew R. Hicks (argued) and Michele M. Goldsmith, Bergman Dacey Goldsmith, Los Angeles, California, for Defendant-Appellee.

Andria Seo, Lauren Lystrup, and Carly J. Munson, Disability Rights California, for Amici Curiae California Association of Parent-Child Advocacy, Disability Rights Advocates, Disability Right California, National Center for Youth Law, and National Disability Rights Network.

**OPINION**

HURWITZ, Circuit Judge:

D.D., an elementary school student, has an emotional disability that interferes with his ability to learn. D.D. sought relief from the Los Angeles Unified School District under the Individuals with Disabilities Education Act ("IDEA"), alleging that he was being denied a free appropriate public education ("FAPE"). D.D. claimed that the District had denied him a FAPE by, *inter alia*, failing to provide a one-to-one behavioral aide and related supportive services. The parties settled their dispute after mediation. D.D. then filed a complaint in the district court, alleging that the District had violated the Americans with Disabilities Act ("ADA") by failing to provide the same services sought in the IDEA proceedings. The district court dismissed the complaint without prejudice for failure to exhaust the IDEA process.

D.D. has appealed the district court's order. In its current posture, this is a case entirely about timing. It is common ground that D.D. can sue the District under the ADA for not providing reasonable accommodations. It is also common ground that the same omissions or actions can give rise to claims both under the IDEA and the ADA. But the Supreme Court has instructed us that if the gravamen of D.D.'s complaint is the school's failure to provide a FAPE, he must first exhaust the IDEA process before seeking ADA relief.

The only disputed issue is whether the gravamen of *this* complaint is the failure to offer a FAPE. Because it is, we affirm.

I

We begin by reviewing the statutory framework.

A

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a [FAPE] to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017). A FAPE "comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* at 748–49 (citing 20 U.S.C. §§ 1401(9), (26), (29)). An eligible child "acquires a 'substantive right' to such an education once a State accepts the IDEA's financial assistance." *Id.* at 749 (citing *Smith v. Robinson*, 468 U.S. 992, 1010 (1984)).

The "centerpiece of the [IDEA's] education delivery system" is an individualized education program ("IEP"). *Honig v. Doe*, 484 U.S. 305, 311 (1988). Crafted by an "IEP Team" of school officials, teachers, and parents, an IEP spells out a plan to meet a child's "educational needs." *Fry*, 137 S. Ct. at 749 (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(II)(bb), (d)(1)(B)). The IEP documents the child's current levels of academic achievement, identifies annual goals, and lists the instruction and services needed to achieve those goals. *Id.* "[S]ervices that enable a disabled child to remain in school during the day provide [him] with the meaningful access to education that Congress envisioned." *Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 73 (1999) (cleaned up).

The IDEA provides a framework for promptly addressing disputes over an IEP. The process begins with a

complaint filed with the responsible state or local educational agency on "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." 20 U.S.C. § 1415(b)(6)(A). Upon receiving a complaint, the agency must convene a "preliminary meeting" with the IEP team and the child's parents, *id.* § 1415(f)(1)(B)(i), and offer an opportunity to resolve the dispute through mediation, *id.* § 1415(e)(1). If the grievance remains, the parties proceed to a due process hearing before an impartial arbiter, *id.* § 1415(f)(1)(A), who determines whether the child received a FAPE, *id.* § 1415(f)(3)(E)(i). Any party aggrieved by the agency's ruling may then seek judicial relief. *See id.* §§ 1415(i)(2)(A), 1415(*l*).

## B

Other statutes also protect the rights of children with disabilities. The ADA promises non-discriminatory access to "the services, programs, or activities" of any public facility, 42 U.S.C. § 12132, and requires "reasonable modifications" to the facility's "policies, practices, or procedures" to avoid discrimination, 28 C.F.R. § 35.130(b)(7)(i). Section 504 of the Rehabilitation Act imposes similar obligations on any federally funded "program or activity." 29 U.S.C. § 794(a). "[B]oth statutes authorize individuals to seek redress for violations of their substantive guarantees by bringing suits for injunctive relief or money damages." *Fry*, 137 S. Ct. at 750.

When disability issues arise in the school context, the substantive requirements of the IDEA may overlap with those of these other statutes. After the Supreme Court read the IDEA as providing the "exclusive avenue" for a child with a disability to challenge his special education program,

*Smith v. Robinson*, 468 U.S. 992, 1009 (1984), Congress amended the IDEA to provide that:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], [the Rehabilitation Act], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*).  This provision makes plain that the IDEA does not preempt other statutory claims by children with disabilities, but requires that a plaintiff first exhaust the administrative process if "seeking relief that is also available under" the IDEA. *Id.*  It is, in other words, "designed to channel requests for a FAPE (and its incidents) through IDEA-prescribed procedures," *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 882 (9th Cir. 2011) (en banc), and prevents plaintiffs from using artful pleading to litigate IDEA issues without first utilizing the IDEA process, *see* S. Rep. No. 99-112, at 12, 15 (1985) (add'l views); H.R. Rep. No. 99-296, at 7 (1985).

## C

In *Fry*, the Supreme Court addressed the issue of when a lawsuit "seeks relief that is also available under" the IDEA and is therefore subject to the exhaustion requirement. 137 S. Ct. at 748 (cleaned up).  Because the IDEA only authorizes relief if a child has been denied a FAPE, the Court

held that the exhaustion requirement of § 1415(*l*) is triggered only if a complaint "charges [the] denial [of a FAPE]." *Id*. at 754. "If a lawsuit charges such a denial, the plaintiff cannot escape § 1415(*l*) merely by bringing her suit under a statute other than the IDEA." *Id.* Rather, she must "first submit her case to an IDEA hearing officer, experienced in addressing exactly the issues she raises." *Id.* But "[a] school's conduct toward such a child—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA." *Id.* "A complaint seeking redress for those other harms, *independent of any FAPE denial*, is not subject to § 1415(*l*)'s exhaustion rule." *Id.* at 754–55 (emphasis added).

In determining "when a plaintiff 'seeks' relief for the denial of a FAPE," the Court has directed our focus to the "remedial basis" of the complaint. *Id.* at 755. Although the plaintiff is the "master of the claim," "artful pleading" cannot excuse exhaustion. *Id.* What matters is "substance, not surface." *Id.* So, we must set aside labels and ask whether the "gravamen of [the] complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id.* In doing so, we must be mindful of the "means and ends of the" various statutes at play. *Id.* "[T]he IDEA guarantees individually tailored educational services, while [the ADA] promise[s] non-discriminatory access to public institutions." *Id.* at 756. Because "[t]he same conduct might violate [both] statutes," a plaintiff may have a claim under the IDEA but can, without exhaustion, "seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation." *Id.*

*Fry* offered two "clues" to direct the gravamen analysis. *Id.* The first comes from two hypothetical questions:

(1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?"; and (2) "could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id.* If both answers are "yes," the complaint is likely not just about the denial of a FAPE, as the "same basic suit" could go forward without the FAPE obligation. *Id.* But if the answers are "no," the complaint probably concerns a FAPE, as "the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." *Id.* The Court provided two examples:

- Take a wheelchair-bound child who sues a school for the lack of access ramps. The missing "architectural feature" could have educational consequences and might be couched as an IDEA violation, for "if the child cannot get inside the school, he cannot receive instruction there." But he could bring the same complaint against another public building, and an adult could bring "a mostly identical complaint against the school," so the "essence is equality of access to public facilities, not adequacy of special education."

- Take, by contrast, a child with a learning disability who sues for the lack of remedial tutoring in math. The action "might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable

accommodation." But even absent reference to a FAPE, "can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial?" "The difficulty of transplanting" this claim to other contexts suggests "its essence—even though not its wording—is the provision of a FAPE."

*Id.* at 756–57.

The second "clue" comes from the history of the proceedings, "in particular" whether "a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute." *Id.* at 757. "A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE." *Id.* "Whether that is so depends on the facts; a court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely." *Id.* "But prior pursuit of . . . administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Id.*

II

With the statutory background in mind, we turn to the facts and procedural history of this case.[1]

A

D.D. is an elementary school student with "a disability that interferes with his ability to learn." D.D. started receiving special education services to address his "emotional disturbance" in kindergarten (the 2015–16 school year). "His disability-related behaviors ranged from being off-task and impulsive to being physically aggressive toward peers and adults." "Starting early in the school year, school staff required one of D.D's parents to pick him up early from school due to his disability-related disruptive behavior." D.D.'s mother unsuccessfully requested a one-to-one aide "to accommodate D.D.'s needs and enable him to participate with his peers."

D.D. transferred to a different school for first grade (the 2016–17 school year), but his "behaviors escalated." He hit "himself, classmates, and school staff," "eloped from the classroom regularly," and "took his frustration out on the property of others." D.D.'s mother again asked about a "one-to-one aide," but D.D.'s teacher "did not make a referral for an aide or a functional behavior assessment." Instead, "[s]tarting in the beginning of the school year, staff again called [D.D.'s mother] regularly to pick D.D. up from school early due to his disruptive, disability-related

---

[1] We draw the facts from the complaint, *see Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019), the administrative complaint that triggered IDEA proceedings, and the settlement agreement.

behaviors, excluding him from participation in all school activities."

Staff soon gave D.D.'s mother "an ultimatum: either pick him up from school or have a family member serve as his one-to-one aide to enable D.D. to participate in the classroom." So, in October 2016, the mother's partner, Albert, quit his job to accompany D.D. "on a nearly daily basis." On a day that Albert was unable to do so, D.D. had a "severe behavioral incident" that prompted the school to summon a psychiatric emergency team. The episode subsided before the team arrived, but D.D. was ultimately hospitalized for a week. After the incident, D.D.'s mother "again explicitly [and unsuccessfully] requested a one-to-one aide for D.D."

The District was "still was not offering [D.D.] behavior supports and services" during the second grade (the 2017–18 school year). Albert continued to accompany D.D. "on most days to monitor [his] behavior and enable him to access his education." But "D.D.'s disruptive, disability-related behavior continued to escalate." D.D.'s mother again requested "a one-to-one aide or [non-public-school] placement," but the "District refused to provide either." After a particularly serious outburst prompted a police response, school staff told D.D. that "if he did not behave, they would call the police and he would end up either in jail or in the hospital again."

D.D.'s mother withdrew him from school in November 2017, and he "stayed out of school for a few weeks due to the stress of attending school at all." D.D. returned to his original elementary school in mid-December and was treated "with a similar pattern of neglect and discrimination." D.D.'s mother "routinely requested communication and updates from his teacher," who never replied. A classroom

aide "provided general support to the classroom, but D.D. was not offered any one-to-one behavior services." Rather, he was "left to his own devices."

D.D. was "finally referred . . . to a nonpublic school," Eko Multi-Purpose Center ("Eko"), in January 2018. While there, D.D. was "not offered one-to-one behavior aide services," but was placed in a smaller program with "more adult assistance." D.D.'s performance initially improved, but he was "routinely bullied on the bus to and from school without behavior[al] support." D.D.'s mother "requested an aide for the bus, but none was provided." Moreover, the "District repeatedly neglected D.D.'s personal safety and needs on campus," and he came home with bruises three times. D.D. was twice attacked by other students, and a staff member once "slammed [his] face against a wall."

In May 2018, D.D.'s mother stopped sending him to Eko for fear of his safety. D.D. transferred to a new non-public school, Vista Del Mar, in September 2018.

B

In March 2018, while at Eko, D.D. filed a "Request for Mediation & Due Process Hearing" with the California Office of Administrative Hearings ("OAH"). The request asserted that the District had failed to offer the services, evaluations, and programs D.D. needed to receive a FAPE. The central allegation was the District's failure to include in D.D.'s IEP a one-to-one aide or behavioral services needed for him to "remain in school" and "access" his education. *See* Request for Hearing at 2 (alleging District's failure "to provide [D.D.] a one-to-one behavior aide or behavior intervention implementation services); *see also id.* at 3 ("District [did not] offer a one-to-one behavior-trained aide to work with [D.D.] to enable him [to] remain in class and

work effectively."), *id.* at 4 ("The IEP contained a behavior support goal . . . . Despite the described behaviors, [D.D.] was not offered behavior services and supports[.]").

The request identified thirteen "problems," including that the District:

- "den[ied] [D.D.] a FAPE" by not offering sufficient services and supports in various areas (e.g., not offering "a more appropriate placement," "one-to-one behavioral aide," or "behavioral development services" for "behavioral management") *(Problems 1–5)*;

- failed to conduct assessments in a manner that adequately informed the IEP team of D.D.'s needs (e.g., that two assessments did not recommend offering D.D. services and supports to manage his behavior, like a one-to-one behavior aide) *(Problems 6–9)*;

- "failed to offer [D.D.] a FAPE" in violation of § 504, including by not offering him "reasonable accommodations" that he needed to "gain meaningful access to his education" (i.e., a one-to-one behavioral aide) *(Problems 10–11)*; and

- discriminated against D.D. in violation of other laws, including the ADA, by not offering him reasonable "accommodations or supports to manage the extreme behaviors resultant from his disability" so he could "access the school's services"

(i.e., "a trained one-to-one behavior aide
and related supports") (*Problems 12–13*).

D.D. sought modifications to his IEP "as an offer of FAPE"
(including a "one-to-one behaviorally trained aide" and
"[r]evis[ion] of [his] behavioral support plan"), funding for
various assessments, compensatory services, and damages.

In April 2018, after mediation, D.D. settled his IDEA
claims against the District.  The settlement agreement
waived all claims "related to, or arising from, [D.D.'s]
educational program," except claims for damages.    In
exchange, D.D. received a modified IEP, with additional
speech and language services; a psychoeducational
assessment to be considered by the IEP team; and various
compensatory services.  The settlement agreement states that
provision of these services "shall not be construed as[] an
admission of what is a [FAPE] for [D.D.]," and it does not
expressly provide for the one-to-one behavior aide or other
related behavior supports that D.D. repeatedly sought from
the District.  *See* Settlement Agreement ¶ 5 (providing only
for an additional psychoeducational assessment to "be
considered" by the IEP team).[2]

C

In January 2019, D.D. filed this action.  The operative
first amended complaint contends that the District
discriminated against D.D. "by excluding him from school,
refusing to offer an aide, only allowing him to stay in school

---

[2] D.D. contends that his "due process complaint sought a change in
placement to a non-public school," but no such request appears in his
requested relief.  D.D. further claims "[t]he settlement provided for . . .
placement at Vista Del Mar non-public school," but no provision
provides for such placement.

if his [p]arent served as an aide, and by enabling him to be subjected to an unsafe school environment."**3**   The ADA claim is predicated on the District's "fail[ure] to provide meaningful and equal access to its educational program in violation of the [ADA], including, but not limited to, by failing to provide D.D. with required accommodations, aids and services."   D.D. alleges he "has suffered, and will continue to suffer loss of equal educational opportunity, as well as humiliation, hardship, anxiety, depression and loss of self-esteem."  He "seeks damages and attorneys' fees and costs as a result" and "[s]uch other relief as the Court deems just and proper."

The district court dismissed D.D.'s operative complaint without prejudice for failure to exhaust the IDEA process.  It found that by challenging the District's failure to provide a one-to-one aide or address his behavioral needs, the complaint was "in essence . . . contesting the adequacy of [his] special education program."   *D.D. v. Los Angeles Unified Sch. Dist.*, No. CV 19-399 PA (PLAX), 2019 WL 4149372, at *3 (C.D. Cal. June 14, 2019) (quoting *Fry*, 137 S. Ct. at 755).   The court rejected any argument that D.D. was not required to exhaust simply because he sought damages in the ADA complaint.   And it found D.D.'s settlement not tantamount to exhaustion.

---

**3** The first amended complaint is essentially identical to the original, except that it alleges no § 504 claim, *compare* Complaint ¶¶ 48–57, and deletes references to D.D.'s IEP, *compare, e.g., id.* ¶ 13 ("The limited approach to [D.D.'s] disability-related behavior [in his December 2016 IEP] was not comprehensive."); *id.* ¶ 17 ("The IEP team again refused to offer a one-to-one aide for D.D."); *id.* ¶ 24 ("District convened an IEP meeting . . . at which [it] finally offered counseling services.  Parent requested a one-to-one aide or [non-public-school] placement to enable D.D. to access his education . . . .   District offered neither.").

A divided panel reversed. *D.D. v. Los Angeles Unified Sch. Dist.*, 984 F.3d 773 (9th Cir. 2020). The majority framed the complaint as challenging the denial of "access" to education and so found the IDEA's exhaustion requirement inapplicable. *Id.* at 787. The dissent read the complaint as in substance challenging the denial of a FAPE. *Id.* at 801 (Rawlinson, J., dissenting). We vacated the panel opinion after a majority of the active judges of the Circuit voted to rehear this case en banc. *D.D. v. Los Angeles Unified Sch. Dist.*, 995 F.3d 670 (9th Cir. 2021).

### III

On appeal, D.D. argues only that the operative complaint should not be subject to the exhaustion requirement, not that he has in fact exhausted the IDEA process or that further exhaustion would be futile. Review is *de novo* because D.D. raises only issues of law. *See N. Cnty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009). Applying *Fry*, we hold that exhaustion is required.

### A

We begin by rejecting D.D.'s argument that the remedial basis of his ADA complaint is not the denial of a FAPE. The crux of D.D.'s complaint is that the District failed to provide "required accommodations, aids and services" that he needed to "access" his education, and that "as a result" of its failure, he suffered loss of educational opportunity, exclusion from school, and harassment by others. The complaint identifies the accommodations denied as a one-to-one aide or other supportive services to manage D.D.'s behavior. These are core components of a FAPE, *see Garret F.*, 526 U.S. at 73; *see also* 20 U.S.C. § 1414(d)(3)(B)(i); U.S. Dep't of Educ., Off. of Special Educ. and Rehab. Servs., *Dear Colleague Letter on*

*Supporting Behavior of Students with Disabilities* 14 (Aug. 1, 2016), https://sites.ed.gov/idea/files/dcl-on-pbis-in -ieps-08-01-2016.pdf, and ones that D.D. repeatedly asked the District to include in his IEP.  In other words, the essence of D.D.'s complaint is that he was injured by the District's failure to provide an adequate special education program, thereby triggering § 1415(*l*)'s exhaustion requirement.  *See Fry*, 137 S. Ct. at 755.

Our reading of D.D.'s complaint is confirmed by *Fry*'s hypotheticals.  As the panel majority candidly conceded, it is "difficult to picture a child claiming that a public library or municipal theater should have provided him with the accommodation D.D.'s mother repeatedly requested of the District—a one-to-one behavioral aide—so the child could participate in the library's story time or attend a theatrical performance," and "even more incongruous" to picture "[a] school visitor asking the District to provide a personal aide." *D.D.*, 984 F.3d at 788.  "The difficulty of transplanting the complaint to those other contexts suggests that its essence— even though not its wording—is the provision of a FAPE." *Fry*, 137 S. Ct. at 757.

D.D. argues we should not focus on the specific accommodations allegedly denied but rather on a more general theory of the case.  But this is not what *Fry* requires. *See id.* (asking whether we could "imagine an adult visitor or employee suing the school to obtain a math tutorial"). Generalizing in the fashion D.D. suggests reduces the first clue's utility, as it is the fact "[t]hat the claim can stay the same in . . . alternative scenarios [that] suggests that its essence is equality of access to public facilities, not adequacy of special education." *Id.* at 756.  Here, "the FAPE requirement is all that explains why [D.D.] (not an adult in that setting or a child in some other) has a viable claim." *Id.*;

*cf. Paul G. v. Monterey Peninsula Unified Sch. Dist.*, 933 F.3d 1096, 1100 (9th Cir. 2019) ("Since a dog would not be among the services a school district would ordinarily provide in a FAPE . . . the gravamen of the *Fry* complaint was not an IDEA claim.").

Our reading of the gravamen of the complaint is also confirmed by application of the second *Fry* clue, the history of the proceedings. D.D.'s "prior pursuit of the IDEA's administrative remedies" is "strong evidence that the substance of [his] claim concerns denial of a FAPE." *Fry*, 137 S. Ct. at 757. Indeed, the allegations in his administrative and federal pleadings are remarkably similar. *See D.D.*, 984 F.3d at 795 (Rawlinson, J., dissenting) (summarizing similarities). In the former, D.D. stressed his disagreements with the District over its failure to include a one-to-one aide or other behavioral development services in his IEP, and expressly alleged that this amounted to "denying [him] a FAPE":

> Here, District has failed to offer [D.D.] adequate placement and services to address his behavioral needs from March 2016 to present. It has been well known to District that [D.D.] has serious behavioral needs, and yet, District has not offered a more appropriate placement to manage his behaviors and/or a one-to-one behavioral aide and behavioral development services to create a behavior support plan by a behavior specialist. . . .

> Despite Parent's continuous requests, District failed to provide a safe placement and behavioral services *to enable him to access his education* and support him by

creating a safe environment for himself and others. Until just a few weeks before filing this complaint, [D.D.] was left in a placement where he was altogether unable to attend class. Finally, he moved to a nonpublic school where Parent is hopeful his behavior needs will be better addressed. *Therefore . . . District denied [D.D.] a FAPE.*

In the latter, the operative complaint, D.D. re-frames the same actions and omissions by the District as an ADA violation, but the gravamen remains the same—that the District failed to offer D.D. supports needed to receive a FAPE. *See Fry*, 137 S. Ct. at 754.

Two recent decisions provide a useful comparison. In *Paul G.*, we required exhaustion where a student challenged denial of an in-state residential educational facility, as the claim could only be premised on the student's right to receive a FAPE, and he previously invoked the IDEA process to secure his rights. 933 F.3d at 1100–01. In contrast, in *McIntyre v. Eugene School District*, we did not require exhaustion because the ADA accommodations allegedly denied—quiet locations for exams, more time for exams, and compliance with an emergency health protocol—could have easily been sought outside of the FAPE context, and the student (who had no IEP) did not invoke the IDEA's machinery. 976 F.3d 902 (9th Cir. 2020). These cases teach that the inquiry necessarily turns on the specific factual allegations of each complaint. The allegations in this case require exhaustion.

We recognize that D.D.'s operative complaint contains some allegations arguably unrelated to the District's obligation to offer a FAPE, such as physical abuse by students and harassment by staff. But D.D. is the "master of

[his] claim," *Fry*, 137 S. Ct. at 755, and rather than drafting a complaint that focused on those allegations or seeking relief only for damages arising from them, he instead offered a complaint that maps almost perfectly onto his IDEA claims. Indeed, although D.D. claims his settlement with the District resolved the IDEA issues, the complaint alleges he "will continue to suffer loss of equal educational opportunity." *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (noting that access to education "is what the IDEA promises").

B

We next reject D.D.'s argument that he need not exhaust because he seeks relief that is not available under the IDEA, namely, compensatory damages for emotional distress. The threshold problem with this argument is that it re-writes D.D.'s ADA complaint. The operative complaint's prayer for relief, which seeks unspecified "damages," is not as limited as D.D. now claims:

> As a result of the [alleged ADA violation], D.D. suffered injury, including, but not limited to, denial of equal access to the benefits of a public education. As a direct and proximate result of the [alleged ADA violation], *D.D. has suffered, and will continue to suffer loss of equal educational opportunity*, as well as humiliation, hardship, anxiety, depression and loss of self-esteem due to Defendant's failure to address and provide accommodations, modifications, services and access required due to D.D.'s disabilities[.] Plaintiff *seeks damages and attorneys' fees and costs as a result*.

As drafted, the complaint seeks damages to remedy loss of educational opportunity.

Moreover, to the extent that D.D. argues that a plea for damages alone vitiates the exhaustion requirement,[4] we disagree. *Fry* reserved the question of whether § 1415(*l*) requires exhaustion "when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests . . . is not one that an IDEA hearing officer may award[.]" 137 S. Ct. at 752 n.4. But we answered this question in our en banc decision in *Payne*: "[E]xhaustion is required in cases where a plaintiff is seeking to enforce rights that arise as a result of a denial of a [FAPE], whether pled as an IDEA claim or any other claim that relies on the denial of a FAPE to provide the basis for the cause of action (for instance, a claim for damages under § 504 . . . , premised on a denial of a FAPE)." 653 F.3d at 875. We squarely held that a plaintiff cannot avoid exhaustion "merely by limiting a prayer for relief to money damages." *Id.* at 877 (citation omitted).

We see no reason to revisit *Payne*. Our sister courts of appeal agree that a plea for damages does not categorically free a plaintiff from exhaustion. *See McMillen v. New Caney Indep. Sch. Dist.*, 939 F.3d 640, 648 (5th Cir. 2019); *J.M. v. Francis Howell Sch. Dist.*, 850 F.3d 944, 950 (8th Cir. 2017); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 63–

---

[4] D.D.'s district court brief did not squarely argue that a complaint seeking only damages is exempt from exhaustion. But, the district court read it as doing so and rejected that claim. D.D.'s opening brief on appeal, while not a model of clarity, does argue that *Payne* does not require exhaustion because he seeks only damages for emotional distress. Given this background, and that the effect of seeking only damages post-*Fry* is a purely legal issue likely to recur, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1213–14 (9th Cir. 2020), we address the argument.

64 (1st Cir. 2002); *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 487–88 (2d Cir. 2002); *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1066 (10th Cir. 2002); *Covington v. Knox Cnty. Sch. Sys.*, 205 F.3d 912, 916–17 (6th Cir. 2000); *Charlie F. v Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 993 (7th Cir. 1996); *N.B. v. Alachua Cnty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996). Moreover, nothing has changed in the decade since *Payne* was decided to warrant reconsideration on this point, except perhaps for the membership of today's en banc panel. Although today's panel surely has the power to overrule a previous en banc decision, when we have already construed a statute that Congress has the authority to amend, *stare decisis* should govern. *See Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 456 (2015) (explaining that "*stare decisis* carries enhanced force when a decision . . . interprets a statute" because critics "can take their objections across the street, and Congress can correct any mistake it sees").[5]

We recognize the facial attraction to a rule that seeking damages alone overcomes the exhaustion requirement, as compensatory damages are not available in IDEA proceedings. *See C.O. v. Portland Pub. Schs.*, 679 F.3d 1162, 1166–67 (9th Cir. 2012). But this approach ignores the central role of exhaustion in the IDEA framework. Congress entrusted the provision of FAPEs to state and local educational experts with the know-how to construct IEPs.

---

[5] Amici ask us to follow *W.B. v. Matula*, which held that exhaustion is not required where a plaintiff seeks only damages. 67 F.3d 484, 496 (3d Cir. 1995). But even the Third Circuit now appears to read *Matula* as a case-specific exception to the general rule, not as excusing exhaustion *whenever* damages are sought. *See Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 280 (3d Cir. 2014).

Requiring exhaustion where disputes assert rights arising from the denial of a FAPE

> allows for the exercise of [such] discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.

*Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir. 1992). In other words, exhaustion serves Congress's intent that educational experts—not the courts—address deficiencies in the provision, construction, or implementation of a student's IEP in the first instance. *See Payne*, 653 F.3d at 876.

By adding § 1415(*l*) to the IDEA, Congress did not merely enact "a pleading hurdle." *Fry*, 137 S. Ct. at 755. Rather, it ensured that non-IDEA claims predicated on the denial of a FAPE could proceed, but only *after* parents directly engage with the experts to seek resolution without litigation. *See* S. Rep. No. 99–112, at 12 (exhaustion should be required for claims that "could have been brought under the [IDEA]"); H.R. Rep. No. 99–296, at 7 (exhaustion should be required for complaints that "involve the identification, evaluation, education placement, or the provision of a [FAPE]"); 20 U.S.C. § 1415(f)–(g) (providing for resolution of IDEA claims through mediation and settlement or, failing that, an administrative hearing followed by appeal). Exhaustion is not needed where "it is improbable that adequate relief can be obtained by pursuing

administrative remedies (e.g., the hearing officer lacks the authority to grant the relief sought)." H.R. Rep. No. 99–296, at 7.  But the IDEA process is designed to remedy the denial of FAPEs, so we can hardly say that plaintiffs alleging such denials will, as a rule, walk away empty handed.[6]

Reading the requirement any other way would do exactly what Congress and *Fry* told us not to—let artful pleading trump substance.  *See* S. Rep. No. 99–112, at 15 (noting that § 1415(*l*) should not be interpreted to let parents "circumvent the [IDEA's] due process procedures and protections"); *Fry*, 137 S. Ct. at 755.[7]

C

We conclude by addressing two questions suggested by Amici's briefing, beginning with whether D.D.'s settlement equates to exhaustion.  A preliminary meeting is the first part of the IDEA process and, by design, a plaintiff need proceed

---

[6] Judge Paez's parade of horribles, including his contention that our decision today somehow discriminates against students with behavioral disabilities, ignores that we today hold only that a plaintiff must exhaust his remedies under the IDEA before filing a complaint whose gravamen is the denial of a FAPE.  The only issue is timing—relief under another statute or theory is not barred, but simply must await exhaustion of IDEA remedies.  And, far from being "oblivious" to the prospect that the same conduct may both result in the denial of a FAPE and give rise to an ADA claim, we expressly acknowledge that possibility.

[7] D.D. also relies on *Witte v. Clark County School District*, which excused exhaustion where a plaintiff sought only damages for past physical injuries *and* had obtained the relief available to him in IDEA proceedings for the denial of FAPE.  197 F.3d 1271, 1275 (9th Cir. 1999).  The problem with this argument—which in any event strikes us as a species of futility—is that D.D. claimed a one-to-one aide was necessary to provide him with a FAPE and settled without obtaining that aide.

no further if it works.  *See* 20 U.S.C. § 1415(f)(1)(B)(i), (iii).  This raises the interesting question of whether settlement after IDEA-prescribed mediation amounts to exhaustion.  *But see Paul G.*, 933 F.3d at 1101–02.  But we need not reach this issue, because D.D. has expressly disclaimed on appeal that he exhausted the IDEA process.

We similarly decline to reach the related question of whether D.D.'s settlement rendered further exhaustion futile.  Despite brief references below to having "obtained all available relief through the administrative process," D.D. conceded at oral argument that he did not preserve the issue for our review.  His failure to do so is underscored by the inadequate record on futility.  *See, e.g.*, *supra* Part II.B & n.2.  Indeed, if D.D. proceeds, the central question the district court must decide is whether D.D. required a one-to-one behavior aide or behavioral services to "access" his education, the very sort of issue an IDEA hearing officer would have addressed absent a settlement, and one that is not answered by the parties' agreement.  We thus leave for another day whether a different settlement agreement—for example, one that gave the student the services allegedly denied, or in which the school district concedes that it has not provided a FAPE—can render further exhaustion futile.  *See Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 33 (1st Cir. 2019); *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 786 (10th Cir. 2013); *W.B. v. Matula*, 67 F.3d 484, 496 (3d Cir. 1995).

IV

We do not today express a view on whether D.D.'s complaint states a plausible ADA claim, whether a differently drafted ADA complaint might not be subject to § 1415(*l*)'s exhaustion requirement, or whether D.D. can in fact exhaust certain claims.  Given the procedural posture of

this case, we simply hold that the first amended complaint that D.D. has drafted is subject to exhaustion and that the district court did not err in dismissing that complaint without prejudice.

**AFFIRMED**.

BUMATAY, Circuit Judge, with whom Judge COLLINS joins and with whom Chief Judge THOMAS, Judge PAEZ, and Judge BERZON join as to Parts I.B and II, concurring in part and dissenting in part.

Our court granted en banc review here to decide whether the Individuals with Disabilities Education Act ("IDEA" or "Act") mandates exhaustion when the operative complaint asserts only claims under the Americans with Disabilities Act ("ADA"). The Supreme Court has already answered *part* of this question. In *Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 755 (2017), the Court instructed us to look to the "gravamen" of the complaint and see if it "seeks redress for a school's failure to provide a FAPE"—a free appropriate public education. If so, since the IDEA guarantees a FAPE to eligible students, a plaintiff must exhaust the IDEA process before suing under the ADA or a similar law. *Id.* On this question, I agree with the majority. The majority dutifully followed the *Fry* gravamen analysis and concluded that D.D.'s complaint concerns an injury to his right to a FAPE. So, I join Parts I, II, III-A, and III-C of the majority opinion.

But that is not the end of the analysis. The Supreme Court has also said that we may need to look to the "specific remedy" sought in the complaint in determining whether IDEA exhaustion is necessary. *Id.* at 752 n.4. Here, I part

ways with my colleagues in the majority.  In my view, by the Act's plain text, when the complaint seeks money damages not available under the IDEA, the plaintiff is freed from IDEA's exhaustion requirement.  I would thus vacate the district court order and remand.  As a result, I respectfully dissent from Parts III-B and IV of the majority opinion.

## I.

### A.

The IDEA expressly does not alter the rights, procedures, and remedies available under the ADA, the Rehabilitation Act, or other laws "protecting the rights of children with disabilities."  20 U.S.C. § 1415(*l*).  Instead, it says that "before the filing of a civil action under such laws seeking relief that is also available under" the IDEA, the Act's procedures "shall be exhausted to the same extent as would be required had the action been brought under" the IDEA. *Id.*  In other words, no matter the named cause of action in the complaint, the IDEA imposes an exhaustion requirement if a plaintiff "seek[s] relief that is also available under" the Act. *Id.*

As the Supreme Court announced in *Fry*, for a plaintiff to be subject to the exhaustion requirement, the plaintiff "must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available.'"  137 S. Ct. at 752. *Fry* then provided two "clues" to determine whether a complaint seeks redress for the denial of a FAPE. *Id.* at 756–57.  First, *Fry* instructs courts to hypothetically ask whether the same claims could be raised outside the school context or by an adult at a school. *Id.* at 756.  If so, then the complaint likely is not about a FAPE. *Id.*  Second, *Fry* says to look at the history of proceedings and consider whether the plaintiff previously invoked the IDEA's procedures. *Id.*

at 757.    In the Court's view, beginning (and later abandoning) IDEA procedures suggests a FAPE complaint. *Id.*

I agree with the majority that both *Fry* "clues" show that the gravamen of D.D.'s complaint is the denial of a FAPE. First, the complaint repeatedly identifies the lack of a one-to-one aide and other special education programs as the source of his injuries.  No adult at a school could ask for such services.    Second, D.D. pursued IDEA administrative proceedings before settling with the School District.  So it's easy to conclude that the *Fry* clues support exhaustion here.

## B.

Yet, as the Court told us in *Fry*, concluding that the complaint involves the denial of a FAPE may not be the end of the exhaustion analysis.  The Court did not address, and explicitly reserved "for another day," whether exhaustion is required when the plaintiff seeks a "specific remedy" that "an IDEA hearing officer may [not] award."  137 S. Ct. at 752 n.4.  In *Fry*, the plaintiffs sought money damages for emotional distress, but asserted that their complaint was not premised on the denial of a FAPE.  *Id.*  The Court remanded to the lower court to determine whether the Frys were right in light of its announced "clues."  *Id.*  The Court then said, "[o]nly if that court rejects the Frys' view of their lawsuit, . . . will the question about the effect of their request for money damages arise."  *Id.*  That open question is presented here—D.D.'s complaint is about the denial of a FAPE, but he only requests money damages.  So we must resolve this issue.

For its part, the majority answers the question "no"— D.D.'s request for only damages does not excuse him from the exhaustion requirement.    Maj. Op. at 22–23.    The

majority believes that the *Fry* open question was resolved in *Payne v. Peninsula School District*, 653 F.3d 863 (9th Cir. 2011) (en banc). In that case, we held that a plaintiff cannot escape IDEA exhaustion "merely by limiting a prayer for relief to money damages." *Id.* at 877. Based on that line alone, the majority concludes that *Payne* mandates exhaustion here. *See* Maj. Op. at 23. The majority also relies on several of our sister circuits' cases, which, I concede, overwhelmingly favor the majority's view that exhaustion is necessary for any FAPE complaint—regardless of the type of remedy sought by the plaintiff. *Id.* at 23–24 (compiling cases). The majority also appeals to the IDEA's legislative history. Citing congressional reports, it concludes that exempting complaints for damages "would do exactly what Congress and *Fry* told us not to—let artful pleading trump substance." *Id.* at 26. I disagree with the majority's analysis on all counts.

## 1.

At all times, we must be guided by the plain meaning of the statute. As a refresher, the IDEA requires exhaustion when the plaintiff is "seeking relief that is also available under" the Act. 20 U.S.C. § 1415(*l*). First, to "seek" means "to try to obtain," "to ask for," and "[to] request." Random House Webster's Unabridged Dictionary 1733 (2d ed. 2001). Second, "relief" in the legal context means "redress or benefit . . . that a party asks of a court"; it's also termed a "remedy." Black's Law Dictionary (11th ed. 2019); *see also* Webster's Third New International Dictionary (9th ed. 2009) (defining relief as a "legal remedy or redress"); *Fry*, 137 S. Ct. at 753 (defining relief as a "redress or benefit that attends a favorable judgment" (simplified)). Indeed, the IDEA itself uses "relief" to refer to the redress granted by courts. *See* 20 U.S.C. § 1415(i)(2)(C)(iii). Third, "available," in this

context, means the relief is "accessible or may be obtained."
*Fry*, 137 S. Ct. at 753 (simplified).  Reading these terms in
sync means that exhaustion is necessary when a plaintiff
asks for a specific redress and "the IDEA enables a person
to obtain [that] redress."  *Id.*

With these definitions in mind, we need to ask whether
money damages are a remedy available under the IDEA.
The answer is generally "no."  The IDEA incorporates no
express grant of damages as a remedy for the denial of a
FAPE.    The  closest  it  comes  is  allowing  for  the
reimbursement of costs for parents who enroll their children
in private schools without the consent or referral of the
school district.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii).  Instead,
the IDEA empowers courts to "grant such relief as the court
determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii).
The Supreme Court has interpreted this language to allow
plaintiffs to seek two types of redress: (1) "prospective
injunctive relief" directed at school officials to ensure a
FAPE;  and  (2)  "retroactive  reimbursement"  for
"expenditures  on  private  special  education"—meaning
"placement  in  private  schools"—that  should  have  been
borne by the State.  *See Sch. Comm. of Burlington v. Dep't
of Educ.*, 471 U.S. 359, 369–70 (1985).  The bottom line for
our purposes then is this: "compensatory damages play no
part" in the IDEA's enforcement scheme.  *C.O. v. Portland
Pub. Schs.*, 679 F.3d 1162, 1166 (9th Cir. 2012).

Based on this understanding of remedies under the
IDEA, I would hold that a complaint seeking damages—
other than reimbursement of private school expenses under
§ 1412(a)(10)(C)(ii)—does not require exhaustion under the
IDEA.   That's because general compensatory damages
cannot be awarded under the IDEA and Congress only
prescribed exhaustion when the plaintiff seeks relief that is

"available" under the IDEA. And this is true even if the complaint is ultimately about the denial of a FAPE.

While the majority is rightfully concerned about exhaustion being avoided by "artful pleading," Maj. Op. at 26, my view of the law does not permit this. If a plaintiff seeks IDEA-style injunctive relief or reimbursement for placement in private school, tacking on a request for money damages will not excuse exhaustion. It is only when a plaintiff forgoes IDEA relief and seeks mere damages under the ADA or the Rehabilitation Act that the plaintiff may bypass § 1415(*l*). This reading accords with the Solicitor General's views in *Fry*. There, he advocated for this textualist approach and asserted that a court could dismiss "any request for relief that is available under the IDEA . . . while retaining jurisdiction only over the request for money damages." Brief for the United States as Amicus Curiae at 32, *Fry*, 137 S. Ct. 743 (No. 15-497).

Under this proper interpretation of the IDEA, this case is straightforward. D.D.'s prayer for relief requests (1) a finding that the School District violated the ADA; (2) damages, including, but not limited to, damages under the ADA; (3) any "other such damages" allowed under federal law; (4) attorneys' fees and costs; and (5) "[s]uch other relief as the Court deems just and proper." D.D. accordingly does not request any IDEA-style injunctive relief or reimbursement for D.D.'s placement in private school.[1] Instead, D.D.'s complaint focuses on the emotional harms he suffered from the School District's handling of his

---

[1] While D.D. was placed in a nonpublic school for a portion of the 2017–2018 school year, his public-school assistant principal referred him there. This allegation therefore does not implicate reimbursement under § 1412(a)(10)(C)(ii).

FAPE grievances.  For these reasons, I would hold that D.D. did not need to exhaust the IDEA procedures to continue with his claims.

**2.**

I also note that the majority does not paint the whole picture of *Payne*.  It is true that *Payne* was concerned that artful pleading could be used to evade the IDEA's exhaustion requirements and stated that "merely . . . limiting a prayer for relief to money damages" does not by itself excuse exhaustion.  653 F.3d at 877.  But *Payne* did not mandate exhaustion any time a complaint alleges a FAPE injury, as the majority seems to believe.  *See* Maj. Op. at 23. Rather, *Payne* then said that exhaustion is only required in a damages suit "[i]f the measure of a plaintiff's damages is the cost of counseling, tutoring, or private schooling—relief available under the IDEA."  *Payne*, 653 F.3d at 877.  In such cases, *Payne* viewed the plaintiffs as still seeking IDEA relief, but styling relief as damages showed a "willing[ness] to accept cash in lieu of services in kind."  *Id.*  In other words, *Payne* required exhaustion when a plaintiff seeks an IDEA remedy or its "functional equivalent," such as money to pay for private school or tutoring, but not when seeking other damages.  *Id.* at 875–77.

So even if *Payne* answers the question left open by *Fry*, the majority is not properly applying it.  The majority still needed to determine whether D.D.'s damages were directly tied to "counseling, tutoring, or private schooling."  *Id.* at 877.  If it did so, the majority would have seen that nothing in D.D.'s complaint shows that to be the case.  So even under *Payne*, I would hold that D.D. did not have to exhaust the

IDEA procedures here.  I fear that the majority has needlessly narrowed *Payne*'s holding.[2]

## II.

Because damages are not a form of relief available under the IDEA, I would hold that plaintiffs who seek them are generally not required to exhaust the IDEA process.  It may be true that this textualist approach may allow more claims to escape exhaustion and frustrate Congress's supposed purpose to have "educational experts—not the courts—address deficiencies" in providing a FAPE in the first instance, as the majority contends. *See* Maj. Op. at 25.  But, "[t]he fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, 502 U.S. 151, 158 (1991).  This applies even if "Congress had a particular purpose in mind when enacting [the] statute."  *In re New Investments*, 840 F.3d 1137, 1141 (9th Cir. 2016).  Because the majority holds otherwise, I respectfully dissent.

---

PAEZ, Circuit Judge, dissenting, with whom Chief Judge THOMAS and Judge BERZON join:

I respectfully dissent.

---

[2] Indeed, the Fifth Circuit, reading *Payne*, considered the Ninth Circuit rule distinct from all the other circuits that mandate exhaustion no matter the remedy sought in the complaint. *See McMillen v. New Caney Indep. Sch. Dist.*, 939 F.3d 640, 647 (5th Cir. 2019) (compiling cases).  The majority then seems to be aligning us with these other circuits, but in doing so, it revises *Payne*'s holding.

Oblivious to the Supreme Court's warning that the danger that the close connection between claims that a student has been denied a "free appropriate public education" ("FAPE") and claims of exclusion from educational opportunity could cause courts improperly to demand exhaustion of non-IDEA claims, the majority has done exactly that. *See Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 755, 757–58 (2017). Because the gravamen of D.D.'s operative complaint is a disability discrimination claim under the Americans with Disabilities Act ("ADA")— and not a disguised FAPE claim under the Individuals with Disabilities Education Act ("IDEA"), as the majority holds—I would reverse the district court's dismissal order and remand.

## I.

As the majority explains, students with disabilities have rights under three different federal statutes: the IDEA, 20 U.S.C. §§ 1400–82, Title II of the ADA, 42 U.S.C. §§ 12131–34, and § 504 of the Rehabilitation Act ("§ 504"), 29 U.S.C. § 794. The IDEA specifically guarantees students a FAPE and provides for an administrative process and hearing for students and parents to pursue equitable relief to address a school district's failure to provide a FAPE. *Fry*, 137 S. Ct. at 748–49. This relief is limited to future special education services and reimbursements for education-related expenditures. *See Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–71 (1985). Title II of the ADA and § 504 guarantee non-discriminatory access to all public activities and programs, and the implementing regulations of the ADA also require reasonable accommodations to enable access to public institutions. *See* 28 C.F.R. §§ 35.149, 35.150. Monetary damages are available under the ADA. *Fry*, 137 S. Ct. at 750 (citing

42 U.S.C. § 12133). Only when seeking relief for the denial of a FAPE must students exhaust the IDEA administrative procedures before pursuing those claims in court. *Fry,* 137 S. Ct. at 754.

The main difference between the IDEA and the ADA is that "the IDEA guarantees individually tailored educational services, while Title II [of the ADA] . . . promise[s] non-discriminatory access to public institutions." *Id.* at 756. A school district's satisfaction of its obligations to a student under the IDEA—i.e., providing a FAPE—does not mean that the district has satisfied its obligations under the ADA. *See K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1100–01 (9th Cir. 2013).

The district court dismissed D.D.'s complaint on the ground that he failed to exhaust his claim through the IDEA's administrative process. Under the Supreme Court's decision in *Fry*, and this court's en banc decision in *Payne v. Peninsula School District*, 653 F.3d 863 (9th Cir. 2011) (en banc), children with disabilities and their parents can select the statute that best fits the harm that they seek to remedy. The question here is whether D.D. plausibly alleges a claim of disability discrimination that is separate from the IDEA claim he previously settled, such that it is not subject to administrative exhaustion under the IDEA, 20 U.S.C. § 1415(*l*).

In the administrative IDEA process, D.D. entered into a settlement agreement resolving all of his IDEA claims regarding his educational program and placement. He expressly preserved his non-IDEA claims for litigation. In this action, D.D. alleges in the first amended (operative) complaint that he suffered discrimination on the basis of his disability in violation of the ADA. He further alleges that he was regularly excluded from the classroom and experienced

emotional and physical injuries as a result of Los Angeles Unified School District's ("the District") failure to provide him with reasonable accommodations.  D.D.'s allegations address the more expansive access requirements of the ADA and the obligation to provide him, as an individual with a disability, with an equal opportunity to participate in the services of a public institution.  In concluding that D.D.'s ADA claim is subject to administrative exhaustion, the majority has broken from legislative safeguards and Supreme Court guidance.

## II.

"We begin, as always, with the statutory language at issue." *Fry*, 137 S. Ct. at 753.  Here, 20 U.S.C. § 1415(*l*). The plain text of that statute requires administrative exhaustion only for claims seeking relief available under the IDEA.  It provides:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(*l*).  "Congress has specifically and clearly provided that the IDEA coexists with the ADA and other federal statutes, rather than swallowing the others." *K.M.*,

725 F.3d at 1097; *see Payne*, 653 F.3d at 872.  In fact, Congress added § 1415(*l*) in response to the Supreme Court's interpretation of the IDEA in *Smith v. Robinson* as providing the "exclusive avenue" for pursuing "an equal protection claim to a publicly financed special education." *See* 468 U.S. 992, 1009 (1984).  Sitting en banc, we previously observed that "the 'except' clause [of § 1415(*l*)] requires that parents and students exhaust the remedies available to them under the IDEA before they seek *the same relief* under other laws."  *Payne*, 653 F.3d at 872 (emphasis in original).

Thus, if a plaintiff seeks relief available under the IDEA, he must first exhaust his claim through the statute's detailed administrative process.  And "[n]on-IDEA claims that do not seek relief available under the IDEA are not subject to the exhaustion requirement, even if they allege injuries that could conceivably have been redressed by the IDEA."  *Id.* at 871.  Disability-based discrimination is not FAPE-based simply because it occurs at school.  *See McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 916 (9th Cir. 2020) (noting that a plaintiff is "not required to exhaust her claims under § 1415(*l*) merely because" the events at issue "occurred in an educational setting").  Both the IDEA and the broader disability discrimination statutes may offer relief for the same mistreatment at school, but if the remedy sought is not for the denial of a FAPE, the child may pursue relief in a civil action premised on those other statutes, without exhaustion.

Although discriminatory conduct "might interfere with a student enjoying the fruits of a FAPE, the resulting [discrimination] claim is not, for that reason alone, a claim that must be brought under the IDEA."  *Payne*, 653 F.3d at 880; *see also Fry*, 137 S. Ct. at 754 ("A school's conduct

toward such a child [with a disability]—say, some refusal to make an accommodation—might injure her in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA."). "If the school's conduct constituted a violation of laws other than the IDEA, a plaintiff is entitled to hold the school responsible under those other laws." *Payne*, 653 F.3d at 877. This is precisely what D.D. seeks to do here.

## III.

In *Fry*, the Supreme Court directly addressed the relationship between the IDEA, the ADA, and § 504. The Court recognized that the same set of facts can give rise to overlapping claims for the denial of a FAPE under the IDEA and disability discrimination under other statutes. 137 S. Ct. at 756. The Court also held that exhaustion is required only when the plaintiff is seeking relief for the denial of a FAPE. *Id.* at 753. After all, an administrative hearing officer cannot give relief for anything else. *Id.*; *see Payne*, 653 F.3d at 871. The Court recognized that a school's conduct toward a student with a disability may still cause cognizable injury other than denying her a FAPE, and in that case, exhaustion is unnecessary. *Fry*, 137 S. Ct. at 754–55. It then held that in such cases, to determine whether administrative exhaustion is required, the task is to discern "the gravamen" of the complaint—whether the complainant "is[,] in essence[,] contesting the adequacy of a special education program." *Id.* at 755. This assessment is to be guided by "the diverse means and ends of the statutes covering persons with disabilities." *Id.*

The majority critically errs in its assessment of the gravamen of D.D.'s operative complaint, demanding exhaustion where it is not required. "[T]he statutory differences [between the IDEA, the ADA, and § 504] mean

that a complaint brought under Title II and § 504 might instead seek relief for simple discrimination, irrespective of the IDEA's FAPE obligation." *Id.* at 756. D.D. first pursued his administrative remedies under the IDEA and successfully resolved his IDEA claims through the mediation and settlement process specifically contemplated by the statute. *See* 20 U.S.C. § 1415(e)–(f). In the present action, he seeks relief for simple disability discrimination. *See Fry*, 137 S. Ct. at 756.

In focusing on the factual common ground between the FAPE-based claim that D.D. settled and does *not* allege in this lawsuit, and the non-IDEA claim he *does* allege, the majority concludes that D.D. must exhaust his ADA claim in a forum from which he cannot obtain further relief. In reaching this result, the majority relies on the *Fry* clues.[1] The *Fry* clues are intended to aid in determining whether a complaint alleging ADA or § 504 claims is nothing more than another way of seeking IDEA educational benefits. Fry does not answer the question of whether a plaintiff who seeks relief unavailable under the IDEA—i.e., damages—must nevertheless pursue administrative exhaustion. *See* 137 S. Ct. at 752 n.4, 754 n.8. To read *Fry* and related Ninth

---

[1] *Fry* emphasized that the suggested "clues" are neither exclusive nor determinative, but merely potentially useful. 137 S. Ct. at 756–57, 757 n.10. Justice Alito, in his partial concurrence joined by Justice Thomas, found them misleading and confusing, explaining that the "clues make sense only if there is no overlap between the relief available under [the IDEA and other federal disability discrimination laws]." *Id.* at 759 (Alito, J., concurring-in-part).

Circuit cases consistently, we are required to analyze the complaint to determine the gravamen, or the harm alleged.[2]

In D.D's due process hearing request, he alleged that the District had failed to address his learning needs, constituting the denial of a FAPE under the IDEA. Specifically, D.D. alleged that the District had failed to (1) provide him with an appropriate placement and services, such as a one-to-one aide, to address his behavioral needs; and (2) offer sufficient services and supports in the areas of (i) occupational therapy, (ii) speech and language development, (iii) psychological counseling, and (iv) social skills. The request also stated that the denial of a FAPE was a violation of § 504 and that the District also separately violated § 504 and the ADA. The request outlined five separate categories of relief, including services related to the provision of a FAPE, funding or reimbursement for parent expenditures related to the provision of a FAPE, compensatory education services, and damages due to violations of § 504 and the ADA.

---

[2] *Payne*, which was decided before *Fry*, sought to provide a method to determine whether a plaintiff had to exhaust true IDEA claims alleged under non-IDEA statutes (the ADA and § 504). *See* 653 F.3d at 874–75. In *Payne*, we held that "[i]f a plaintiff can identify a school district's violation of federal laws other than the IDEA and can point to an authorized remedy for that violation unavailable under the IDEA, then there is no reason to require exhaustion under § 1415(*l*)." *Id.* at 881. *Payne* remains good law for its holding that the "exhaustion requirement applies to claims only to the extent that the relief *actually* sought by the plaintiff could have been provided by the IDEA." *Id.* at 874 (emphasis added). The issue in *Fry* was essentially the same as that in *Payne*, but *Fry* directed courts to focus on the gravamen of the complaint and not just on the relief sought, as in *Payne*. Although certain aspects of *Payne* have been supplanted by *Fry*'s gravamen approach, it remains instructive.

As part of the IDEA settlement agreement, D.D. waived all of his educational claims arising under the IDEA and California special education statutes and regulations. The "agreement d[id] not release any claims for damages . . . which could not have been asserted in proceedings under the IDEA and/or California special education statutes and regulations." D.D. thus expressly reserved the right to pursue "any claims that can be made under" other federal laws, including the ADA.

After resolving his IDEA claims through settlement, D.D. followed the path prescribed by the Supreme Court in *Fry* and filed this action against the District for violations of the ADA and § 504 (for which the administrative IDEA process provides no remedy). In the operative complaint, D.D. omitted the § 504 claim, seeking only money damages for disability discrimination under the ADA.

## IV.

### A.

The first *Fry* clue offers two hypothetical questions for use in determining the gravamen of a school-based disability-discrimination complaint: 1) whether the plaintiff could bring the same claim outside the school setting, and 2) whether an adult could bring the same claim within the school setting. *Fry*, 137 S. Ct. at 756.

D.D.'s complaint focuses on his repeated exclusion from school. At the outset, he alleges that the District "excluded [him] from school and all of the programs and services made available to others without disabilities." He then alleges that the "District discriminated against [him] on the basis of his disability by removing him from his classroom; sending him home early on multiple occasions, and requiring a parent to

attend school with [him] to serve as his one-to-one aide instead of providing one."

D.D. alleges that during his kindergarten and first-grade years, school staff "regularly" called D.D.'s parents to pick him up from school early, which "exclud[ed] him from participation in all school activities." When D.D. was in first grade, "staff presented Parent an ultimatum: either pick him up from school or have a family member serve as his one-to-one aide to enable D.D. to participate in the classroom." As a second-grader, "D.D. was left to his own devices" and was "commonly" allowed to "le[ave] class and walk[] around the campus for almost the entire school day unattended." In sum, D.D. alleges that "[r]ather than offering meaningful and appropriate behavior accommodations and allowing D.D. to attend school for the same amount of time as typical peers, District discriminated against D.D. on the basis of his disability by excluding him from school, refusing to offer an aide, only allowing him to stay in school if his Parent served as an aide, and by enabling him to be subjected to an unsafe school environment."

D.D. further alleges that due to the District's failure to accommodate him, he was routinely bullied on the school bus, came home with bruises multiple times, was attacked by students, and had his head slammed into a wall by a staff member. To deal with the school bus issues, D.D.'s parents "requested an aide for the bus, but none was provided." District staff allegedly threatened D.D., telling him "that if he did not behave, they would call the police and he would end up either in jail or in the hospital again." These threats "traumatized" D.D., "making it impossible for him to attend school altogether." Along with a "denial of equal access to the benefits of a public education," D.D. alleges that he suffered "humiliation, hardship, anxiety, depression[,] and

loss of self-esteem" as a result of the District's "failure to address and provide accommodations, modifications, services[,] and access required due to D.D.'s disabilities."

Clearly, the gravamen of D.D.'s complaint is a challenge to his lack of *access* to the educational program or services the District provided. I fail to understand how, for example, the District's alleged failure to provide a one-to-one aide on the school bus has anything to do with the *adequacy* of the instructional program the District provided, as the majority effectively insists. D.D. alleges that the District denied him the opportunity to attend school *at all* because of his disability-related behavior, unless accompanied by a parent. D.D.'s claim thus sounds squarely in the ADA: he alleges that he was denied meaningful access to his public educational program because the District failed to provide reasonable accommodations for his disability. These allegations are more than sufficient to satisfy the pleading standard for an ADA claim.[3]

The difference in the statutes' goals is key to understanding whether administrative exhaustion should apply to D.D.'s Title II ADA claim: while the IDEA focuses on the provision of an individualized educational program to

---

[3] The District Court dismissed D.D.'s action pursuant to Federal Rule of Civil Procedure 12(b)(6) on the basis that the complaint failed to state a claim. Because D.D. stated a valid claim for disability discrimination under the ADA, the District's motion to dismiss under Rule 12(b)(6) should have been denied. Exhaustion is an affirmative defense subject to a motion for summary judgment, not dismissal for failure to state a claim. *See Albino v. Baca*, 747 F.3d 1162, 1169, 1171 (9th Cir. 2014) (en banc) (overruling *Payne* on the procedural issue and holding that exhaustion questions should be decided on summary judgment, not on a motion to dismiss under Rule 12(b)(6), unless the failure is clear from the face of the complaint).

meet a child's specific educational needs, *see Honig v. Doe*, 484 U.S. 305, 311 (1988), the ADA focuses on the barriers that exist to deny the student the opportunity to obtain such individualized attention, *Fry*, 137 S. Ct. at 756. Administrative exhaustion "is not intended to temporarily shield school officials from all liability for conduct that violates constitutional and statutory rights that exist *independent* of the IDEA and entitles a plaintiff to relief *different* from what is available under the IDEA." *Payne*, 653 F.3d at 876 (emphasis in original).

D.D. requested reasonable accommodations from the District, including a one-to-one behavior aide, "so that he could have equal access to his public education, and the programs and services offered by LAUSD to the same extent as his peers without disabilities." D.D.'s requests for the District to support his behavioral needs so that he could remain in school, and do so without being subjected to attacks, threats, and abuse, could not be brought in exactly the same way against a public library, or by an adult plaintiff, such as an employee or visitor to the school. But visitors to public libraries and adults employed by or visiting schools could well request similar, if not precisely the same, relief, to ensure access and nondiscriminatory participation—for example, nearby security officers, or permission to bring in a service animal.

Like such officers or animals, D.D.'s requested one-to-one behavior aide was intended to enable D.D. to remain in the classroom and participate alongside his peers. For example, in the operative complaint, D.D. alleges that after he was sent home because of his problematic behavior, his mother requested a one-to-one aide to "accommodate D.D.'s needs and enable him to participate with his peers." He further alleges that school staff required his parents to "either

pick [D.D.] up from school or have a family member serve as his one-to-one aide to enable D.D. to participate in the classroom." As a result, "[D.D.'s parent] attended school with D.D. on most days to monitor D.D.'s behavior and enable him to access his education to the same extent as students without disabilities." After "D.D.'s disruptive, disability-related behavior continued to escalate[,] Parent again requested reasonable accommodations for her son's disability-related behavior, including a one-to-one aide." Additionally, "[D.D.] was routinely bullied on the bus to and from school without behavior support. Parent requested an aide for the bus, but none was provided." A library visitor or adult seeking school access could similarly request as an accommodation the presence of security personnel or service animals to address both the plaintiff's behavioral issues and discriminatory and abusive behavior by others in response to those issues.

Given these allegations, the first *Fry* clue is helpful in determining whether D.D.'s ADA claim is a disguised FAPE claim, as long as we recognize that the analogy between other locations or other plaintiffs and the child seeking to assure school access need not be exact. Indeed, it is unlikely that the *Fry* clues were intended to exclude students with behavioral—as opposed to physical—disabilities from recourse under Title II of the ADA because children's needs at school may require accommodations somewhat different from—but analogous to—those appropriate for adults or in other public buildings. The majority's rote application of the first *Fry* clue is therefore incorrect.

The majority makes much of the fact that D.D.'s operative complaint alleges that the District failed to provide one of the same services that he pursued administratively under the IDEA—a one-to-one classroom aide. But this

overlap does not transform a claim that seeks relief under Title II of the ADA into a disguised FAPE claim. Where a child with disabilities has experienced both a denial of a FAPE in violation of the IDEA and exclusion from school in violation of the ADA, some overlap in the facts relevant to each is expected. As the Supreme Court observed, "[t]he same conduct might violate all three [disability discrimination] statutes." *Fry*, 137 S. Ct. at 756. And as the "master of the claim," a plaintiff has a right to bring claims under each. *See id.* at 755. For purposes of determining the applicability of administrative exhaustion, the question is whether D.D. plausibly alleged a claim of disability discrimination separate from the IDEA claim he previously settled.

D.D. plausibly alleged a claim of disability discrimination based on his exclusion from the classroom, and he reasonably sought a one-to-one aide as one remedy for that exclusion, apart from any educational services an aide could have provided. As explained in *Fry*, a child may seek a wheelchair ramp to remedy the denial of access to a school building or to remedy the denial of his right to a FAPE—which he cannot receive "if [he] cannot get inside the school." *Id.* at 756. Similarly, a one-to-one aide could be necessary not only for D.D. to take advantage of other forms of instructional assistance as required by the IDEA but also for D.D. to access and remain in school, as required by the ADA. It is possible that the two different needs may even be met by two different aides, with different qualifications and attributes. The facts in D.D.'s operative complaint allege that without an aide, D.D. would not be able to remain in school at all, and thus would have no opportunity to receive a public education. "After all, if the child cannot get inside the school, he cannot receive instruction there." *Id.*

Further, even if the one-on-one aide were precluded under a *Fry* analysis—which I do not believe it is—the only consequence would be that any damages specifically traceable to denial of that aide could not be recovered. The gravamen of the complaint would remain discriminatory exclusion from school and discriminatory abuse, threats, and physical attacks while in school, and damages traceable to those circumstances would still be available.

## B.

The second *Fry* clue is the procedural history of the plaintiff's pursuit of relief. *See id.* at 757. The majority characterizes D.D.'s complaint as "artful pleading" because he first pursued an IEP, but does not allege this in his complaint—leading the majority to conclude D.D.'s claim is necessarily a disguised FAPE claim. But in his operative complaint, D.D. tells the story of the District's alleged violations of his rights. Under the majority's reasoning, it is not clear what D.D. could have done to avoid the accusation of "artful pleading." *Fry* urges courts to "consider substance, not surface": the principal inquiry is whether a plaintiff's complaint "seeks relief for the denial of an appropriate education." *Id.* at 755.

In concluding that administrative exhaustion of D.D.'s ADA claim is required, the majority has transformed § 1415(*l*) from a provision specifically crafted to preserve the availability of other forms of relief alongside the IDEA into one that forecloses all cases involving the mistreatment of students with disabilities by a school. The majority has taken away from D.D. and future litigants exactly what Congress and the Supreme Court in *Fry* sought to protect: the right to file an action alleging claims of disability discrimination outside the IDEA's limited, education-

centered scope without having to exhaust the IDEA administrative process.

Having resolved his IDEA claims through settlement, D.D. now pursues a claim whose gravamen relates to his discriminatory treatment on the basis of his disability, not the adequacy of the individualized education provided by the District. *Fry* directs courts to ensure that students who receive special education and have an IEP are not denied their right to pursue their *non*-IDEA claims directly in court. 137 S. Ct. at 754–55. D.D.'s operative complaint makes clear that his ADA claim does not challenge the adequacy of his instruction and related services, and therefore, does not "seek[] relief that is also available under [the IDEA]." 20 U.S.C. § 1415(*l*); *see McIntyre*, 976 F.3d at 915 ("Thus, because McIntyre seeks relief for the District's failure to provide specific accommodations that are neither 'special education' nor a 'related service'—the constituent parts of the IDEA's FAPE requirement—she does not seek relief for the denial of FAPE.").

## V.

Requiring IDEA exhaustion before seeking relief not available under the IDEA contravenes congressional intent, departs from Supreme Court precedent, and restricts students' rights under other disability discrimination statutes like the ADA. *See Payne*, 653 F.3d at 874 ("The IDEA's exhaustion requirement applies to claims only to the extent that the relief actually sought by the plaintiff could have been provided by the IDEA."). The majority opinion will discourage students and their families from settling IDEA administrative due process complaints and will be a trap for unsuspecting parents who believe that settlement language that preserves non-IDEA claims does just that. By upholding the district court's dismissal order, the majority

has effectively sanctioned a system in which students can involuntarily and unknowingly waive their civil rights claims, even when preserved in writing by the parties.

The scope of IDEA administrative hearings is limited: hearing officers can only address and resolve whether a school has met its obligation to provide a student with a FAPE. *Fry*, 137 S. Ct. at 754. A plaintiff like D.D., seeking redress for something other than a denial of a FAPE, cannot obtain any relief from the administrative hearing process. Where, as here, a student seeks monetary damages under the ADA for harms not redressable under the IDEA, further administrative efforts would be futile. *See Payne*, 653 F.3d at 871–72. There is simply no further relief that such a student could obtain through the IDEA's administrative process. The majority has unduly burdened students with disabilities with having to proceed with a full hearing at the administrative level for claims that do not implicate a FAPE simply because the discrimination they suffer happens at school.

For the above reasons, I would reverse the district court's dismissal order and remand for further proceedings related to D.D.'s ADA claim. I respectfully dissent.[4]

---

[4] Because I disagree with the majority's holding that the gravamen of D.D.'s operative complaint is a disguised FAPE claim, I do not address whether exhaustion is unnecessary when the relief sought—damages—cannot be awarded by an IDEA hearing officer. On that issue, I agree with Judge Bumatay's dissent that exhaustion is not required. I therefore join Parts IB and II of Judge Bumatay's dissent as an alternative basis for allowing D.D.'s ADA damages claim to proceed.

I also agree with Judge Berzon that, if the question were properly before us, we should hold that the exhaustion requirement is satisfied

BERZON, Circuit Judge, with whom Chief Judge Thomas and Judge Paez join, dissenting:

I join Judge Paez's dissent in full and join the dissenting portions of Judge Bumatay's opinion. I write separately to call attention to the "interesting question" mentioned, but not decided, by the majority: "whether settlement after IDEA-prescribed mediation amounts to exhaustion." Majority op. 27. Although the issue may not be a live one in this appeal, *see id.* at 27, it is a serious question that, had it been properly raised, would, in my view, have provided a much more straightforward resolution of this case than the fact-bound issue debated in the majority opinion and Judge Paez's dissent.

As then-Chief Judge Briscoe of the Tenth Circuit persuasively demonstrated, the exhaustion provision in the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(*l*), "can reasonably, and indeed should, be interpreted as merely requiring a claimant to make full use of the procedures outlined in §§ 1415(f) and (g) to attempt to resolve her IDEA claim"—including use of the mediation and settlement conference provisions included in the statute. *A.F. ex rel Christine B. v. Espanola Pub. Schs.*, 801 F.3d 1245, 1256 (10th Cir. 2015) (Briscoe, C.J., dissenting); *see* 20 U.S.C. § 1415(f)(1)(B)(i) (mandating a "[p]reliminary meeting" to allow "the parents of the child [to] discuss their complaint, and the facts that form the basis of the complaint," and to afford "the local educational agency . . .

when the parties have settled disputed IDEA issues through the administrative hearing and mediation process, as here. I therefore join Judge Berzon's dissent in full.

the opportunity to resolve the complaint," unless the parties agree in writing to waive the meeting or agree "to use the mediation process described in subsection (e)"); § 1415(f)(1)(B)(iii) (setting forth procedures for the parties to execute a "[w]ritten settlement agreement" if "a resolution is reached to resolve the complaint" at the preliminary meeting); *id.* § 1415(e) (detailing a mediation process allowing parents and educational agencies "to resolve the complaint" through "a legally binding agreement," *id.* § 1415(e)(2)(F)).

The exhaustion provision should be read to encompass a settlement reached through the IDEA's prescribed procedures "not only because the statutory framework anticipates, and in fact encourages, resolution of IDEA claims by way of mediation, but also because a mediated resolution leaves nothing to be decided at a due process hearing or in an administrative appeal." *A.F. ex rel Christine B.*, 801 F.3d at 1256 (Briscoe, C.J., dissenting). Here, for example, the settlement agreement expressly recognized that D.D.'s damages claims could not be resolved in an administrative hearing. The agreement did "not release any claims for damages required to be asserted in a court of law *and which could not have been asserted in proceedings under the IDEA*." A fair reading of this language is that the parties intended to allow damages claims under the Americans with Disabilities Act to go forward because they could not have been brought under the IDEA.

Both the First and Tenth Circuits have excused exhaustion as futile in cases in which the plaintiffs engaged in the IDEA's prescribed process and reached agreements with their school districts granting them all the relief they sought under the IDEA. *Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 33 (1st Cir. 2019); *Muskrat v. Deer Creek Pub.*

*Schs.*, 715 F.3d 775, 786 (10th Cir. 2013). "Having achieved success through their interactions with local school officials, there was no need for the [plaintiffs] to seek a[n administrative] hearing," *Doucette*, 936 F.3d at 30, and "it would have been futile to then force them to request a formal due process hearing—which in any event cannot award damages—simply to preserve their damages claim," *Muskrat*, 715 F.3d at 786. But resort to the less-than-clear futility doctrine is unnecessary under Chief Judge Briscoe's persuasive interpretation of the statute.

I note that if our court were to adopt Judge Bumatay's position that exhaustion is not required when plaintiffs seek money damages not available under the IDEA, Bumatay op. 32, the settlement problem would be diminished. Typically, once plaintiffs have settled their IDEA claims, a claim for damages is what is left.

But even if that position is not adopted, I would still read the statute not to require further exhaustion after plaintiffs have settled their IDEA claims. As Chief Judge Briscoe asked, "why would Congress, after creating a framework that quite clearly encourages resolution of IDEA claims by various means, force a claimant to avoid resolution of her claim by mediation or preliminary meeting . . . ? Doing so would effectively render superfluous the mediation and preliminary meeting provisions of the statute." *A.F. ex rel Christine B.*, 801 F.3d at 1256 (Briscoe, C.J., dissenting).

We have also recognized the preeminent importance of settlement efforts in this context, given that "the slow and tedious workings of the judicial system make the courthouse a less than ideal forum in which to resolve disputes over a child's education." *Clyde K. v. Puyallup Sch. Dist., No. 3*, 35 F.3d 1396, 1402 (9th Cir. 1994). "[E]veryone's interests are better served when parents and school officials resolve

their differences through cooperation and compromise rather than litigation." *Id.* When the issue is properly raised, we should read the statute in a way that does not subvert one of its central goals—promoting the resolution of educational disputes through settlement.